

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-06-302-CR

JERRY WAYNE GILMORE                                          APPELLANT

V.

THE STATE OF TEXAS                                                STATE

------------

FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

A jury convicted Appellant Jerry Gilmore of the manufacture of more than 400 grams of a controlled substance (methamphetamine), and the trial court sentenced him to thirty years' incarceration.  In eight points, Gilmore contends that the evidence was legally and factually insufficient to establish that he was present during the manufacturing process and to establish that he manufactured

---

[1]*See* TEX. R. APP. P. 47.4.

over 400 grams of methamphetamine; that the statutory definition of a controlled substance is unconstitutionally vague as applied to him; that the trial court erred by denying a specific jury instruction; and that the prosecutor made an improper comment on Gilmore's choice to not testify at trial, which should have caused a mistrial. We will affirm.

## II. LEGAL AND FACTUAL SUFFICIENCY POINTS

### A. Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal sufficiency review, we

2

may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). We must presume that the fact-finder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.3d at 414-15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). To reverse under the second ground, we must determine, with some objective basis in the record, that the great

3

weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

### B. Jury Verdict Finding Gilmore Guilty of Manufacturing Methamphetamine

Gilmore first argues that the evidence was legally and factually insufficient to tie him to the scene where the methamphetamine was manufactured. A jury can find a person guilty of manufacturing a controlled substance if the State proves that the person knowingly and intentionally chose to manufacture such a substance. TEX. HEALTH & SAFETY CODE ANN. § 481.112(a) (Vernon 2003). Methamphetamine is a controlled substance. *Id.* § 481.102(6). For the State to obtain a conviction for the manufacture of a controlled substance, the State must affirmatively link[2] the defendant either to an interest in the place where the manufacturing occurred or to the actual act of manufacturing. *See East v. State*, 722 S.W.2d 170, 172 (Tex. App.—Fort Worth 1986, pet. ref'd); *Harris v. State*, No. 02-04-00202-CR, 2005 WL 1838976, at *1 (Fort Worth—Aug. 4, 2005, pet. ref'd) (mem. op.) (not designated for publication).

---

[2]The court of criminal appeals has noted that the "affirmative links" rule is not an independent test of legal sufficiency, and because the term may imply a rule independent from the legal sufficiency test, use of the term "link" is the better practice. *Evans v. State*, 202 S.W.3d 158, 162 n.9 (Tex. Crim. App. 2006). We similarly hereinafter use the term "link" in this opinion.

4

In the typical drug *possession* case, the State is required to link the defendant to the drug in order to protect the innocent bystander from conviction based solely upon his proximity to someone else's drugs. *Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005); *Harris*, 2005 WL 1838976, at *1. In a drug *manufacturing* case, however, while the State must still provide a link, the purpose of such a requirement is to protect the innocent bystander who merely inadvertently happens onto a methamphetamine lab. *Harris*, 2005 WL 1838976, at *1.

Although the analysis is basically the same whether the offense is the possession of a controlled substance or the manufacture of a controlled substance, the factors considered may be different. *East*, 722 S.W.2d at 172; *Harris*, 2005 WL 1838976, at *1. For example, manufacture of methamphetamine occurs in the open, as opposed to possession, which may occur in a drawer or an envelope. *East*, 722 S.W.2d at 171-72; *Harris*, 2005 WL 1838976, at *1. Also, the manufacture of methamphetamine typically generates a strong odor, not merely a residual odor. *See East*, 722 S.W.2d at 171-72; *Harris*, 2005 WL 1838976, at *1.

Furthermore, the paraphernalia used in methamphetamine manufacturing are relatively cumbersome and typically are in plain view, and the quantity of contraband produced is relatively high. *See East*, 722 S.W.2d at 172; *Harris*,

5

2005 WL 1838976, at *1. As a consequence, the fact that a defendant has a prolonged presence on the premises weighs more heavily against that defendant when methamphetamine is being manufactured on the premises than it does in a mere possession case. *See East*, 722 S.W.2d at 172; *Harris*, 2005 WL 1838976, at *1.

In this case, the jury heard a substantial amount of circumstantial evidence linking Gilmore to the manufacture of the methamphetamine. First, the State presented the testimony of a police officer who conducted surveillance of the house where, later that day, police discovered the methamphetamine lab while executing a search warrant. The officer testified that when he arrived at approximately 8:15 a.m., he saw two vehicles parked in front of the house (one of which was a blue pickup truck), and that approximately one hour later he saw Gilmore and another man exit the house, get into the blue pickup truck, and leave the house. That officer testified that during this time, he did not see anyone else go into or leave the house. On cross examination, the officer admitted that one of the vehicles parked in front of the house obstructed his view of the front door. But the officer was steadfast in his testimony that he clearly saw Gilmore and another male come from the front of the residence before leaving in the truck. This officer also

testified that he continued to watch the house after Gilmore and his associate left and that no one else went into or even drove by the house.

A second police officer testified that he also staked out the residence in question in a separate unmarked vehicle on the same block that morning. He tailed the blue pickup truck when it left the house, and he followed the truck to a nearby convenience store. This officer testified that, after coming out of the store, Gilmore and his associate drove in the direction of the residence. The jury never heard whether Gilmore and his associate reached their destination or the circumstances of their ultimate arrest.[3]

Approximately two hours later, around 11:00, a police unit arrived at the house and executed a search warrant. The State presented testimony that when the police executed the search warrant, the strong smell of ammonia, a smell commonly associated with methamphetamine labs, permeated the front yard, the interior of the house, and especially the back yard, where the smell was the strongest. Police observed a liquid petroleum gas tank in the back yard, and it had a blueish discoloration at its valve, which is consistent with a discoloration made by anhydrous ammonia. Inside the house, police discovered

---

[3]The trial court granted Gilmore's motion to suppress and suppressed "any fruit of the arrest and/or detention of the defendant in this case." The trial court ruled, however, that "any challenges to the search of the actual residence are denied."

a variety of containers, substances, liquids, and products in the house indicating methamphetamine manufacturing. Pictures taken by the police of items found in the house were admitted into evidence and reflected that the police discovered several plastic containers, mounds of empty Sudafed boxes, along with their emptied blister packs, several cans of starter fluid, coffee filters, and large containers of salt. These pictures also showed a blender (which, testimony established, contained a residue of ground pseudoephedrine) and a hot plate taken from inside the house. The items found at the house were "typical of a clandestine methamphetamine lab, a Nazi lab."

The State spent a great deal of time, however, on a single tub of liquid found in the kitchen sink. The jury heard from both police and private forensic experts who testified that when the police discovered this plastic tub, it contained a complex, bubbling liquid. This liquid, according to the testimony, was bubbling because of a chemical reaction of its various mixed ingredients, which included anhydrous ammonia and ground Sudafed tablets. The result of this reaction was approximately 12.3 grams of pure methamphetamine. Testimony established that, while the police interrupted the process too early to establish an exact time frame, the concoction could have been mixed approximately three to four hours before the police discovered it, which would place the mixture time at approximately 8:00 a.m. that morning. Gilmore's

8

fingerprint was on this tub of bubbling, methamphetamine-producing liquid.

Gilmore's attorney questioned several of the forensic experts concerning that fingerprint. The attorney consistently elicited testimony that there was no way to determine when the fingerprint was left on the container, how long it had been there, or the circumstances of its placement on the container.

In his defense, Gilmore briefly re-called the original investigating officer and elicited testimony that this officer had driven by the house in the morning before going to get the search warrant. Gilmore's questions related to the placement of the blue pickup truck at the house and whether the officer checked the registration or ran the license plates on the vehicle. Gilmore did not call any other witnesses to testify on his behalf and he did not, himself, testify. On appeal, Gilmore points out that his associate provided police with a key to the residence so that the police could execute the search warrant, that mail at the residence was addressed to the associate, and that one of the associate's business cards was at the residence.

Viewing the evidence in the light most favorable to the prosecution, we hold that the evidence is legally sufficient to support the jury's determination that Gilmore, beyond a reasonable doubt, knowingly and intentionally manufactured methamphetamine. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. First, a police officer who could see the entire front of the residence,

except for the front door, sat in front of the house for approximately one hour and then saw Gilmore come from the front of the house. From this the jury could have reasonably inferred that Gilmore must have come from inside the house and that he was there for at least the approximate hour between the time that the officer arrived at the stakeout and the time Gilmore left.

Furthermore, the jury heard evidence that the odor of ammonia was very strong in the house itself, that there were multiple items commonly associated with methamphetamine manufacturing in plain view in the house, and that methamphetamine was being manufactured in the house. Importantly, the jury had fingerprint evidence directly connecting Gilmore to a tub of liquid where an ongoing chemical reaction was actually producing methamphetamine when the police entered the house. We presume that the jury resolved the conflicting inferences about when the fingerprint was left on the tub in favor of the prosecution, and we defer to the jury's apparent resolution that Gilmore must have left the fingerprint while he was involved in manufacturing methamphetamine in the tub that morning. *See Jackson*, 443 U.S. at 329, 99 S. Ct. at 2793.

Based on this evidence, the jury could have reasonably inferred that Gilmore did not innocently and inadvertently happen onto a methamphetamine lab, but was an active participant in the drug manufacturing process. *See East*,

10

722 S.W.2d at 172; *Harris*, 2005 WL 1838976, at *1. Thus, the evidence was legally sufficient to support the jury's finding that Gilmore manufactured methamphetamine.

Having determined that the evidence was legally sufficient to support his conviction, we must additionally evaluate whether the evidence was factually sufficient. Viewing the entire record in a neutral light, we cannot say that the evidence was so weak that the fact-finder's determination was clearly wrong and manifestly unjust. *See Watson*, 204 S.W.3d at 414. While it is true that there was no evidence of the arrest itself presented at trial (or whether Gilmore tried to flee, possessed any drugs or money, or was impaired by drug use at the time of the arrest), the jury did hear evidence linking Gilmore to the tub of methamphetamine-producing liquid. And although some items found at the residence linked Gilmore's associate more closely to the residence than Gilmore, we nonetheless cannot say that the evidence presented by the State was so greatly outweighed by conflicting evidence that the fact-finder's determination was manifestly unjust. *Watson*, 204 S.W.3d at 414-15, 417. Accordingly, we overrule Gilmore's second point.

**C.    Jury Verdict Finding Gilmore Guilty of Manufacturing More Than 400 Grams of Methamphetamine**

Gilmore additionally argues that the evidence was legally and factually insufficient to establish that he manufactured the quantity of 400 grams or

11

more of methamphetamine. The indictment alleged that Gilmore did "intentionally OR knowingly manufacture a controlled substance, namely methamphetamine of more than four hundred grams, including any adulterants or dilutants." The indictment tracks section 81.112(f) of the Texas Health and Safety Code, providing that manufacture of a controlled substance in Penalty Group One is a first-degree felony "if the amount of the controlled substance to which the offense applies is, *by aggregate weight, including adulterants or dilutants*, 400 grams or more." TEX. HEALTH & SAFETY CODE ANN. § 481.112(f) (emphasis added). An adulterant or dilutant "means any material that increases the bulk or quantity of a controlled substance, regardless of its effect on the chemical activity of the controlled substance." *Id.* § 481.102(49).

At trial, a state-sponsored forensic chemist testified that the tub bearing Gilmore's fingerprint contained approximately 1,950 grams of moderately bubbling liquid, 12.3 grams of which was pure methamphetamine. The rest of the liquid was byproduct, unreacted pseudoephedrine, solvent, and undissolved binder. The State additionally elicited the following testimony from the chemist:

> [Prosecutor]: [A]re you familiar with the definition contained in the Health and Safety Act about what a controlled substance is? . . . The definition of a controlled substance where it talks about including in a drug – a drug, an adulterant, and a dilutant of which the term includes the aggregate weight of any mixture or solution or other substance containing a controlled substance?

12

[Chemist]: Yes, sir.

[Prosecutor]: Based on that definition . . . would it be your testimony that the items we've talked about here containing methamphetamine contained more than 400 grams based on that definition?

[Chemist]: Yes, sir.

On cross examination, Gilmore's attorney elicited testimony from the chemist that while the solvents technically add bulk to the methamphetamine, the purpose of the solvents is to facilitate methamphetamine production—to separate the substances so as to result in a pure methamphetamine. Therefore, the chemist testified, that *in his opinion* and *under his interpretation* of the statute, the solvents should not count as an adulterant or dilutant but rather as "trash" in the manufacturing process.

Notwithstanding the forensic chemist's admitted "opinion," the jury heard testimony that the total weight of the liquid in the tub with Gilmore's fingerprint on it was almost five times more than 400 grams, and that the non-methamphetamine portion of the liquid consisted of other products used in the manufacture of methamphetamine. Viewing this evidence in the light most favorable to the prosecution, any rational trier of fact could have found Gilmore guilty of manufacturing more than 400 grams of methamphetamine under the statutory definition, which, as the jury heard, includes not only pure methamphetamine but also adulterants and dilutants. *Id.* §§ 481.102(40),

13

.112(f); *Jones v. State*, 235 S.W.3d 783, 786 (Tex. Crim. App. 2007). Accordingly, we overrule Gilmore's third point.

Having determined that the evidence was legally sufficient to support the jury's verdict, we must now address Gilmore's argument that the evidence was factually insufficient. *See Watson*, 204 S.W.3d at 414. Looking at all the evidence in a neutral light, even if the jury only considered the tub to which the State directly linked Gilmore, the evidence was clear and undisputed that the tub contained approximately 1,950 grams of liquid. Therefore, we cannot say that the determination that Gilmore manufactured more than 400 grams of methamphetamine under the statutory definition of what the jury must include in its calculation of the "amount" of the controlled substance that was manufactured was clearly wrong or manifestly unjust. *See Jones*, 235 S.W.3d at 786. The great weight and preponderance of the evidence does not contradict the jury's verdict. *See id.* Accordingly, we overrule Gilmore's fourth point.

### III. CONSTITUTIONALITY OF THE APPLICABLE STATUTE

Gilmore's fifth point of error is that the statutory definition of "controlled substances" is unconstitutionally vague as applied to him in violation of his Due Process and Equal Protection rights. There are two types of challenges to the constitutionality of a statute: that the statute is unconstitutional as applied to

14

the defendant or that the statute is unconstitutional on its face. *Barnett v. State*, 201 S.W.3d 231, 232-33 (Tex. App.—Fort Worth 2006, no pet.). Gilmore asserts on appeal only that the statute is constitutional as applied to him.[4] An as-applied constitutional challenge must be raised in the trial court to preserve error. *Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995); *Barnett*, 201 S.W.3d at 232-33; *Burton v. State*, 194 S.W.3d 686, 688 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Toma v. State*, 126 S.W.3d 528, 529 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). Because Gilmore failed to request that the trial court find the statute unconstitutional as applied to him, Gilmore has waived this argument on appeal. *See, e.g., Burton*, 194 S.W.3d at 688. We therefore overrule Gilmore's fifth point.

## IV. JURY CHARGE

In his sixth point of error, Gilmore complains that the trial court erred by denying his requested jury instruction on mere presence. Gilmore requested that the trial court include an instruction that "mere presence at the scene

---

[4]Indeed, the court of criminal appeals has rejected all facial constitutional challenges to Texas Health and Safety Code section 481.002(5). *See Wright v. State*, 201 S.W.3d 765, 767 (Tex. Crim. App. 2006); *Seals v. State*, 187 S.W.3d 417, 422 (Tex. Crim. App. 2005); *Melton v. State*, 120 S.W.3d 339, 343-44 (Tex. Crim. App. 2003); *Ex parte Kinnett,* No. AP-75,611 (Tex. Crim. App. Feb. 13, 2008), *available at* http://www.cca.courts.state.tx.us/OPINIONS/ PDFOPINIONINFO2.ASP?OPINIONID=16530&FILENAME=AP-75,611.PDF.

where contraband is found is not sufficient evidence to convict" Gilmore of the manufacturing charge. The trial court denied Gilmore's request.

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731-32. Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error. TEX. CODE CRIM. PROC. ANN. art. 36.19 (Vernon 2006); *see also Abdnor*, 871 S.W.2d at 731-32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g).

In other words, a properly preserved error will require reversal as long as the error is not harmless. *Almanza*, 686 S.W.2d at 171. In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.*; *see also Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

Upon timely request, an accused is entitled to an affirmative defense instruction on every issue raised by the evidence, whether it is strong, feeble, unimpeached, or contradicted, and even if the trial court is of the opinion that it is not entitled to belief. *Warren v. State*, 565 S.W.2d 931, 933-34 (Tex. Crim. App. 1978). The trial court is required to give an instruction on every defensive issue when properly requested. *Golden v. State*, 851 S.W.2d 291, 295 (Tex. Crim. App. 1993). However, mere presence is not a statutorily recognized affirmative defense, and the trial court need not necessarily include it in a jury charge. *Williams v. State*, 906 S.W.2d 58, 64 (Tex. App.—Tyler 1995, pet. ref'd). When an alleged defensive theory, such as "mere presence," serves only to deny the existence of an essential element of the State's case, an affirmative charge on the theory is not required. *Green v. State*, 566 S.W.2d 578, 584 (Tex. Crim. App. 1978). In such an instance, instructing the jury on the State's burden to prove guilt beyond a reasonable doubt adequately protects a defendant. *Williams*, 906 S.W.2d at 64.

First, in this case, there was no evidence presented raising "mere presence" apart from Gilmore's attorney's assertions during closing arguments. Rather, the record includes evidence from which the jury could draw inferences that were contrary to Gilmore's mere presence in the house—fingerprint evidence directly linking Gilmore to a tub of liquid actually producing

17

methamphetamine, evidence from which a reasonable person could infer as officers directly observing Gilmore exit the house after being there for at least one hour starting at around 8:15 a.m., and evidence that the bubbling mixture in the tub bearing Gilmore's fingerprint could have been mixed within the three to four hours before the police discovered it (which would possibly put the mixture time at approximately 8:00 a.m. that morning).

Furthermore, even if Gilmore had presented evidence that he was merely present at the time, his requested instruction is an affirmative charge on a defensive theory which serves only to negate the element of intentional and knowing participation in the manufacture of methamphetamine. *See Green*, 566 S.W.2d at 584. Therefore, the trial court was not required to include a mere presence instruction. *See Williams*, 906 S.W.2d at 64. The jury charge properly instructed the jury on the State's burden to establish guilt beyond a reasonable doubt, and this instruction was adequate. *See id.* Because error did not occur in the jury charge, we overrule Gilmore's sixth point. *See Abdnor*, 871 S.W.2d at 731.

### V. IMPROPER COMMENT BY THE PROSECUTOR DURING CLOSING ARGUMENTS

Gilmore's seventh and eighth points deal with the following exchange during closing arguments at the guilt phase of the trial:

> [Prosecutor]: You have got a fingerprint on a bubbling container of manufactured methamphetamine. Now, this

18

[d]efendant and [defense attorney] want to run away from that as far and as fast as they can.

[Defense Attorney]: Objection . . . .

The Court: Sustained.

[Defense Attorney]: Ask that the jury be instructed to disregard the impropriety and not draw any inferences from the comments made by the government's attorney.

The Court: The jury is instructed to disregard that portion of argument.

[Defense Attorney]: . . . I would ask for a mistrial, Your Honor.

The Court: Denied.

Gilmore argues that the prosecutor's remark was an improper comment on his choice not to testify at trial and that the trial court erred by not granting his motion for a mistrial.[5]

A comment on an accused's failure to testify violates the accused's state and federal constitutional privileges against self-incrimination. *Montoya v. State*, 744 S.W.2d 15, 34 (Tex. Crim. App. 1987) (op. on reh'g); *Smith v. State*, 65 S.W.3d 332, 339 (Tex. App.—Waco 2001, no pet.). In addition, the Code of Criminal Procedure mandates that

---

[5]The State argues in its appellate brief that Gilmore's objection was too broad to preserve error. However, Gilmore specifically noted that the comment violated Gilmore's right to the protections of the Fifth Amendment of the United States Constitution. Therefore, we will address the merits of Gilmore's points.

19

> Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause.

TEX. CODE CRIM. PROC. ANN. art. 38.08 (Vernon 2005).

To determine if a prosecutor's comment violated article 38.08 and constituted an impermissible reference to an accused's failure to testify, we must decide whether the language used was manifestly intended or was of such a character that the jury naturally and necessarily would have considered it to be a comment on the defendant's failure to testify. *Id.*; *see Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001); *Fuentes v. State*, 991 S.W.2d 267, 275 (Tex. Crim. App.), *cert. denied*, 528 U.S. 1026 (1999).

The offending language must be viewed from the jury's standpoint, and the implication that the comment referred to the accused's failure to testify must be clear. *Bustamante*, 48 S.W.3d at 765; *Swallow v. State*, 829 S.W.2d 223, 225 (Tex. Crim. App. 1992). A mere indirect or implied allusion to the defendant's failure to testify does not violate the accused's right to remain silent. *Wead v. State*, 129 S.W.3d 126, 130 (Tex. Crim. App. 2004); *Patrick v. State*, 906 S.W.2d 481, 490-91 (Tex. Crim. App. 1995), *cert. denied*, 517 U.S. 1106 (1996).

Nothing in the record suggests that the prosecutor manifestly intended to comment on Gilmore's failure to testify. *See Wead*, 129 S.W.3d at 130. Furthermore, we cannot say from the jury's standpoint, that the comment was a clear attack on Gilmore's choice to not testify. *See Bustamante*, 48 S.W.2d at 765. The prosecutor's remarks were more likely seen as a reference to Gilmore's constant attempts to establish, during his cross examination of expert witnesses, that it was impossible to determine when Gilmore's fingerprint was made on the tub of methamphetamine.

Therefore, the record shows no abuse of discretion on the part of the trial court in denying Gilmore's motion for mistrial. *See Wead*, 129 S.W.3d at 130. Moreover, on this record, a reasonable trial court could have concluded that an instruction to disregard would effectively remove any possible prejudice caused by the prosecutor's comment. *See id.* Accordingly, we overrule Gilmore's seventh and eighth points.

## VI. CONCLUSION

Having overruled all of Gilmore's points, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL F:   GARDNER, WALKER, and MCCOY, JJ.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

21

DELIVERED: March 13, 2008